UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSE MANUEL VILLARREAL, | § | |
| TDCJ # 01976024, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:19-0650 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

State inmate Jose Manuel Villarreal, who proceeds *pro se*, is incarcerated in the Texas Department of Criminal Justice–Correctional Institutions Division ("TDCJ"). Villarreal filed a petition for a federal writ of habeas corpus seeking relief from a state conviction (Dkt. 1). Respondent Lorie Davis filed a motion for summary judgment (Dkt. 6) and a copy of the state court records (Dkt. 7), and Villarreal has responded (Dkt. 12). Villarreal's claims are ripe for decision. Having now considered the petition, briefing, all matters of record, and the applicable legal authorities, the Court determines that the petition should be **denied** for the reasons that follow.

## I.  BACKGROUND

### A.  Procedural Background

Villarreal pleaded guilty to aggravated robbery in the 9th District Court for Montgomery County, Hon. Kelly W. Case presiding, Case No. 13-06-065569-CR. After he pleaded true to two enhancements, the court sentenced him to life imprisonment (Dkt.

7-3, at 415-16).[1]

On February 3, 2016, the appellate court affirmed Villarreal's conviction. *Villarreal v. State*, No. 09-14-00503-CR, 2016 WL 416670 (Tex. App.–Beaumont, Feb. 3, 2016, pet. ref'd); Dkt. 7-17. The Texas Court of Criminal Appeals refused his petition for discretionary review on July 27, 2016 (Dkt. 7-1). Villarreal did not petition the United States Supreme Court for a writ of *certiorari*.

On July 15, 2017, Villarreal executed a state habeas application (Dkt. 7-31, at 7-25) (WR-88,029-01). The trial court entered findings of fact and conclusions of law recommending denial of habeas relief (Dkt. 7-39, at 51-56). On April 11, 2018, the Texas Court of Criminal Appeals denied the application without written order (Dkt. 7-25). Villarreal claims that he did not receive notification of the denial until January 24, 2019 (Dkt. 1, at 4, 9).

On February 20, 2019, Villarreal executed his petition for a writ of habeas corpus in these federal proceedings (Dkt. 1).

### B. Factual Background

Villarreal was represented at trial by Jose Mata, with Brian Burns serving as co-counsel. Before trial, counsel filed a motion to suppress evidence obtained as a result of a traffic stop, which the court denied after a hearing (Dkt. 7-7, at 90-92). The appellate court summarized the facts as follows:

---

[1] Throughout this memorandum opinion, the Court's citations to specific pages in the record refer to the pagination of docket entries on the Court's electronic case-filing ("ECF") system.

At the suppression hearing, Houston police officer Carlos Cantu testified that on the day of the offense, he was patrolling an area known for burglary of vehicles. Cantu saw a darkly tinted Dodge Charger drive into the Twin Peaks parking lot, circle the lot while passing by empty parking spaces, and never attempt to either park or conduct business. He testified that this type of behavior is consistent with that of burglary suspects. Cantu followed the Charger as it left Twin Peaks and entered a Fuddrucker's parking lot, where the driver of the Charger engaged in the same behavior as in the Twin Peaks lot. The Charger left Fuddrucker's and parked at a nearby Whataburger. Three men got out of the Charger and went inside Whataburger. Cantu decided that the men must have been looking for a place to eat, so he left Whataburger and returned to Twin Peaks.

Shortly thereafter, Cantu saw the Charger return to Twin Peaks and park. A GMC Yukon subsequently pulled into the lot, circled around, and parked near the Charger. The Charger's driver approached the Yukon to speak with the Yukon's driver and then returned to the Charger. A few minutes later, Cantu saw a Mercedes enter the parking lot and park near the Charger. Cantu testified that he later learned that Villarreal was driving the Mercedes. The three men from the Charger, the driver of the Yukon, and Villarreal looked inside the trunk of the Mercedes and then entered the Mercedes. Cantu testified that he believed the men were involved in a drug transaction. When the men exited the Mercedes and returned to their respective vehicles, all three cars left Twin Peaks and Cantu followed the Mercedes.

Cantu saw Villarreal fail to signal when changing lanes. Because Cantu was in an unmarked unit, he contacted an officer in a marked patrol vehicle to conduct a traffic stop. Officer Keith Mountain testified that he responded to Cantu's call and when he approached the Mercedes, Mountain saw Villarreal turn without signaling. Mountain initiated a traffic stop for failure to signal. When Mountain ran Villarreal's driver's license, he discovered open warrants for traffic violations. Mountain placed Villarreal in handcuffs and advised Villarreal that he was being detained for an open warrant. He did not give any *Miranda* warnings.

When Cantu arrived at the scene, he asked Villarreal if the Mercedes contained anything illegal, and Villarreal admitted that the Mercedes contained a small amount of cocaine and showed Cantu where the cocaine was located. Cantu testified that Villarreal was nervous, sweating, and breathing heavily. Cantu subsequently opened the trunk and observed a bag of diamonds. When Cantu asked Villarreal about the diamonds, Villarreal said, "Just take me to the station, and I'll tell you everything." At

no time did Cantu read Villarreal *Miranda* warnings, nor did he see anyone else give the warnings. According to Mountain, the Mercedes had to be towed, so an inventory was required per police department policy.

Montgomery County Detective Chad May testified that he was investigating the aggravated robbery of a jewelry store when the Houston Police Department contacted him about Villarreal. He learned that Villarreal was in possession of items stolen from the jewelry store and wanted to speak with May. After May gave Villarreal *Miranda* warnings, Villarreal waived his rights and agreed to speak with May. Villarreal discussed the details of the jewelry store robbery with May. Villarreal told May that on the day of the traffic stop, he met with the four men from the Yukon and the Charger to show them that he had not sold the jewelry. At the conclusion of the hearing, the trial court denied Villarreal's motion to suppress.

*Villarreal*, 2016 WL 416670, at *1–2.

After the trial court denied his motion to suppress, Villarreal pleaded guilty. At the plea proceeding, the court found Villarreal competent (Dkt. 7-7 at 94). The court advised Villarreal that the range of punishment on his offense, aggravated robbery, was from "5 to 99 years and/or life in prison," and Villarreal stated that he understood (*id*. at 94). The court then admonished Villarreal that his plea would waive his right to a jury trial:

THE COURT:      You have the right to a jury trial. In fact, I think earlier this week we had lined up a jury and ready to go to trial. But the decision was made after, I guess, counsel for the defense discussed with the prosecution how to proceed, to solely hear the motion to suppress. But you have the right to jury trial. I want to make sure you understand by initialing off to the side, signing the back of this admonitions form that you are waiving your right to a jury trial. Do you understand that? Basically, you're telling me you do not want to have a jury trial?

[VILLARREAL]:   Yes, Your Honor.

|              |                                                                                    |
|--------------|------------------------------------------------------------------------------------|
| THE COURT:   | I know you're not waiving your right to appeal.                                    |
| [VILLARREAL]:| So I have the right to appeal the suppression hearing?                              |
| THE COURT:   | Yes. Yes. You do have the right to appeal the suppression hearing and whatever punishment I reach after I hear all the evidence. |

(*Id*. at 94-95). The court then clarified that, based on the two enhancements, the minimum punishment was 25 years in prison, and that the parties had no agreement as to the sentence:

|              |                                                                                    |
|--------------|------------------------------------------------------------------------------------|
| THE COURT:   | Okay. So based on those enhancement[s], the punishment range, the minimum goes up to 25. The maximum stays the same. No agreement. You understand everything up to this point, Mr. Villarreal? |
| [VILLARREAL]:| Yes, Your Honor. The only thing I'm not clear on— and I'm in no way expressing any complaint against my attorneys. I think they did a good job for me today and the last couple days in the suppression hearing. So I'm not trying to complain against them. But what I am not clear on is if I have the right or how certain of the enhancement paragraphs. |

(*Id*. at 96-97). Villarreal then questioned whether his two "non-aggravated" federal drug offenses were sufficient for enhancement:

|              |                                                                                    |
|--------------|------------------------------------------------------------------------------------|
| [VILLARREAL]:| I've been sentenced twice to federal commitment. I have questions regarding the drug offenses, non-aggravated, nothing to do with any violence. I don't know if automatically I get enhanced or not. Maybe that is the case. I'm just stating Your Honor I do not wish to go back on the agreement. |

(*Id*. at 98). The court then asked Villarreal, "So your question is: Are those sufficient to enhance you under Texas state law; is that what I'm understanding?" and Villarreal

answered, "Yes, Your Honor" (*id*. at 99-100). Villarreal reiterated, "Your Honor, this—it's not a question. I do not wish to go back on the agreement. I just want to have it on record that I don't know because they are not aggravated offenses" (*id*. at 100). The court then explained that Villarreal's prior offenses were sufficient for enhancement:

> THE COURT: They don't have to be aggravated. All they have to be is a felony offense in the state of Texas. If the federal offense is—can be compared to or found to be similar—I guess is the best way to say it—to a state felony offense, those will be considered enhanceable offenses. That's the way the case law reads. Aggravating factors, 3G, none of that stuff matters as far as enhancement.
>
> MR. MATA: That comes into play for punishment purposes, but not enhancement.
>
> THE COURT: Yeah, it absolutely doesn't come in guilt/innocence. You're absolutely, correct. All right. So have we answered your questions?
>
> [VILLARREAL]: Yes, Your Honor.

(*Id*.). The court then took his plea:

> THE COURT: . . . To the charge of aggravated robbery, first-degree felony, how do you plea? Are you guilty or not guilty?
>
> [VILLARREAL]: I plead guilty.
>
> THE COURT: Subject to and without waiving your appeal and with regard to the issues in the motion to suppress that your defense attorneys raised, are you pleading guilty because you are, in fact, guilty and for no other reason? Nobody is forcing you, holding a gun to your head, forcing you to do this, correct?
>
> [VILLARREAL]: Nobody is forcing me to plead guilty.

(*Id*. at 101). Villarreal pleaded true to both enhancements (*id*. at 102). The court found

him guilty of aggravated robbery. At the punishment phase, the court sentenced him to life in prison.

On direct appeal, Villarreal challenged the trial court's denial of his motion to suppress. He argued that he had been under arrest when Houston police officers questioned him, and therefore the cocaine, diamonds, and his interview with Detective May all should have been excluded as the product of an illegally obtained statement. The court rejected his arguments, holding that the evidence was not required to be suppressed because, "[a]lthough Villarreal gave unwarned statements to the Houston officers, the record does not indicate that Villarreal made such statements in response to coercion." *Villarreal*, 2016 WL 416670, at *2. The court further held that "Detective May's subsequent administration of *Miranda* warnings to Villarreal removed the conditions that precluded admission of Villarreal's previous statement." *Id*. The court overruled all of Villarreal's issues and affirmed the judgment against him.

In state habeas proceedings, Villarreal raised claims that his trial counsel was ineffective and failed to consult adequately with him before trial; that his guilty plea was not knowing and voluntary; that the trial court's rulings denying dismissal of his attorney and his motion to suppress, as well as the court's failure to rule on his right to self-representation, violated his constitutional rights; that the cumulative errors at trial violated his constitutional rights and rendered his guilty plea involuntary; and that his appellate counsel was constitutionally ineffective (Dkt. 7-31, at 7-25).

Villarreal provided an affidavit in state habeas proceedings stating that he had conflicts with Mata, his trial counsel, and that Mata was not sufficiently available to him:

During the 17 months before my trial date of October 6, 2014, the attorney-client relationship between Mr. Mata and I became conflictive and unproductive. The biggest problem was Mr. [Mata's] lack of communication with me. Despite my many attempts, both by letter and phone, to have Mr. Mata give me information about my case, I was unsuccessful. Mr. Mata did not answer <u>1</u> of my many letters and would not return the calls my mother and sister made on my behalf.

(Dkt. 7-38, at 66) (emphasis original). He also maintained that Mata had visited him only three times before trial, for a total of approximately one hour:

In the 17 months that Mr. Mata was appointed to represent me, he came to see me 3 times at the county jail. His first visit in late July–early August, lasted less than 10 minutes and was limited to him introducing himself and telling me that the State had a "slam dunk" case again[st] me. Mr. [Mata's] second visit, months later, lasted about 15 minutes and was limited to me answering Mr. [Mata's] questions as to why another attorn[e]y had [come] to visit me in the county jail and answering his questions about if I belonged to any prison gang (I [don't]). On neither of these 2 visits did Mr. Mata have the case file with him nor was he prepared and willing to answer any of my many questions.

Mr. [Mata's] 3rd and final visit came in late September of 2014 and lasted about 30 no more than 40 minutes. On this visit Mr. Mata had Brian C. Burns with him. The purpose of this visit was to go over the events of the day of my arrest. I used this opportunity to stress to Mr. Mata that my vehicle had been searched without a warrant and that the Miranda rights had not been given to me by the arresting officers prior to me being questioned. No other subject was discussed during this visit.

All together the 3 visits, scattered throughout a period of 17 months, total about <u>1</u> hour. When compared to the great amount of effort the State put into my prosecution, as evidenced by the States discovery file that consist[ed] of 43 discs, plus 602 pages of documents and over 25 witnesses, <u>1</u> hour of pretrial consultation, simply can not be considered to have been enough time to inform me of all the relevant facts and circumstances about my case.

(*Id*. at 66-67) (emphasis original). Villarreal averred that he had "diligently" brought the pretrial preparation issue to the attention of Mata and the trial court, citing to his exhibits

attached to his state application (*id*. at 67). Finally, Villarreal maintained that Mata had not informed him sufficiently of the State's punishment-phase evidence before Villarreal entered his guilty plea:

> Because of the lack of meaningful pretrial consultation, I was never informed by Mr. Mata of the 14 witnesses and 5 extraneous offenses that the State used again[st] me during the sentencing phase. Had I been warned about the 14 witnesses and 5 extraneous offenses to be used again[st] me, before I plead[ed] guilty, I would have never agreed to plead guilty.

(*Id*. at 67).[2]

The state habeas court directed Mata and Burns to file affidavits responding to Villarreal's claims. Mata's affidavit stated that, before trial began, Villarreal had agreed that he would plead guilty if the court denied the motion to suppress:

> To the best of my recollection, the district attorney on the case conveyed an offer of fifty years incarceration with a plea of true to the deadly weapon. Applicant rightfully rejected the plea bargain offer. Co-counsel and I commenced preparing for a jury trial. On the eve of a jury trial, Mr. Villarreal expressed a willingness to have a motion to suppress the traffic stop, search of his vehicle, and his statements. The agreement was that if the motion to suppress was not granted, Mr. Villarreal was to plea[d] guilty to the indictment and have Judge Kelly Case [assess] punishment.

(Dkt. 7-39, at 1). Counsel averred that he then attempted to suppress Villarreal's statements, as well as the cocaine and the diamonds:

> During the motion to suppress hearing, we argued that Mr. Villarreal was under arrest and not free to leave once he was arrested for traffic warrants and handcuffed by the Houston Police Department officers after the traffic stop. Therefore, Mr. Villarreal's unwarned statements about the cocaine

---

[2] Villarreal also presented the state habeas court with an affidavit from his sister stating that Villarreal did not have a good relationship with Mata at the time of trial, that he tried to remove Mata from the case, that Mata would not return her calls, and that Villarreal was "forced to plead guilty because the Judge would not give him a different attorney" (*id*. at 64).

and diamonds were not legally obtained and therefore should have been suppressed. Further, we argued that the unwarned admissions about the cocaine and diamonds tainted the subsequent warned admissions to the cocaine and diamonds.

(*Id.* at 2, ¶ 4). As stated above, the trial court denied the motion to suppress after a hearing.

Mata also averred that, before the plea proceeding, he had discussed the punishment-phase evidence with Villarreal:

> I did inform Mr. Villarreal of the type of evidence that I anticipated the State would seek to admit during the punishment phase. The State gave the Defense numerous disclosures concerning alleged extraneous offenses. These disclosures included alleged offense dates, incident reports, witness names, and complainant names. I informed Mr. Villarreal that I anticipated that the State would attempt to introduce testimony from as many witnesses that the State could possibly get to appear at the sentencing hearing. I informed Mr. Villarreal that either co-counsel or I would have the opportunity to cross-examine all witnesses that the State produced. Co-counsel and I informed Mr. Villarreal that we would attempt to discredit any State's witness based on any issues uncovered from our review of the incident reports and from Mr. Villarreal's recollection of any such incidents.

> Co-counsel and I went over all the alleged extraneous offenses for which the State anticipated introducing evidence at sentencing. There were numerous extraneous offenses of aggravated robberies, firearms offenses, drug offenses, an aggravated kidnapping, an unauthorized use of motor vehicle, and an intoxicated assault that Mr. Villarreal was on bond for when the charged offense occurred. We allowed Mr. Villarreal the opportunity to refute and discuss each and every listed extraneous offense disclosed by the State. We did not recommend that Mr. Villarreal testify at the sentencing due to the fact that he would have had to admit under oath to committing many of the extraneous offenses.

(*Id.* at 1-2, ¶¶ 1-2). Mata stated that he had advised Villarreal that the punishment-phase evidence would lead to a severe punishment, up to a life sentence, if the motion to suppress were denied:

The pre-trial discussions and consultations with Mr. Villarreal and I consisted of how to best address the multitude of extraneous offenses listed in the numerous discovery responses filed with the District Clerk by the State. There were over fourteen extraneous offenses listed including nine aggravated robberies. Mr. Villarreal was already considered a habitual [felon] due to a 2004 federal intent to distribute cocaine conviction and a 2006 federal conviction for intent to import marijuana. Essentially, co-counsel and I discussed with Mr. Villarreal that if Judge Case did not sustain the motion to suppress the punishment would be severe. By severe, we relayed to Mr. Villarreal that we anticipated that the sentence would be towards the higher end of the possible punishment range or possibly a "Life" sentence in prison.

(*Id*. at 2, ¶ 3). Counsel recalled that Villarreal was aware that his punishment would be severe:

Mr. Villarreal acknowledged that his punishment would likely be severe. In fact, Mr. Villarreal acknowledged this fact with the police interrogators . . . In the recorded police interrogations, Mr. Villarreal acknowledged the severity of the charge and his criminal history and he made an effort to cooperate with the authorities to mitigate his situation. He also attempted to have the authorities disregard or not consider his sister's involvement in the aggravated robbery conspiracy.

(*Id*.).[3]

The state habeas court entered findings of fact and conclusions of law recommending denial of relief (Dkt. 7-39, at 51-56). Regarding Villarreal's claims that his counsel was constitutionally ineffective, the court found that the affidavits filed by Mata and Burns were "credible" and that both attorneys were "well qualified to represent defendants in felony criminal cases" (*id*. at 52, ¶¶ 6-7). The court also found that Mata

---

[3]     Co-counsel Burns filed an affidavit nearly identical to Mata's (Dkt. 7-38, at 54-56). Burns' affidavit additionally cited to Villarreal's statements on the record during the plea proceeding that he was not complaining about his attorneys. *See* Dkt. 7-7, at 96-97 (transcript of plea proceedings).

had adequately consulted with Villarreal by meeting with him "on multiple occasions before trial" to explain the State's evidence, "including numerous extraneous offenses"; by giving Villarreal "the opportunity to explain or refute each of those extraneous offenses"; by discussing with Villarreal "the general strategy for the suppression and sentencing hearings" and providing "straightforward" counsel about "the likely lengthy sentence that would result from [Villarreal's] significant criminal history"; and, by "engag[ing] in meaningful discussions with [Villarreal] in preparation for trial" (*id*. at 52, ¶¶ 8-11). The court noted that Villarreal had "indicated on the record at trial that he . . . was satisfied with the quality of his trial representation" (*id*. at 53, ¶ 14). It also determined that Villarreal had not shown prejudice:

> The applicant has not suggested how counsel's alleged deficiencies had any effect on the outcome of the case.

> The applicant has not explained what counsel should have done differently in hearings, how further communication with counsel would have benefitted the applicant's case, or why a purportedly deteriorated attorney-client relationship was problematic in this case.

(*id*. at 52, ¶¶ 12-13). The habeas court concluded that Villarreal had failed to show that he had been denied effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984) (*id*. at 54, ¶ 2).

The habeas court also rejected Villarreal's claim that it had failed to rule on his requests for self-representation, which were filed before the suppression hearing and guilty plea, finding that he had not clearly asserted the right:

> The record does not show that the trial court was ever aware that the applicant filed a request to exercise his right to self-representation.

The applicant was represented by counsel at the time he filed his letter seeking self-representation.

The applicant never brought his request to represent himself to the trial court's attention.

The trial court never ruled on the applicant's request to exercise his right of self-representation.

The applicant did not clearly, unequivocally, and timely assert his right to self-representation.

After filing a letter seeking to exercise his right to self-representation, the applicant continued to accept the representation offered by Mata and Bums.

The applicant proceeded to trial and participated in suppression and sentencing hearings with the assistance of counsel and without raising an issue to the trial court regarding the applicant's request for self-representation.

The applicant voluntarily accepted representation, and therefore waived his right to self-representation.

(*Id*. at 53-54, ¶¶ 21-28).   The court therefore concluded that he had waived his right to self-representation (*id*. at 55, ¶ 4).   It further stated, "The trial court need not have considered the applicant's *pro se* motion to proceed *pro se* because the applicant was then represented by counsel and was not entitled to hybrid representation" (*id*. ¶ 5   (citing Texas authority)).

Additionally, the court concluded that Villarreal's challenge to its denial of his motion to suppress was not cognizable on habeas review because it had been rejected on direct appeal (*id*. ¶ 6).

After the habeas court recommended that all habeas relief sought by Villarreal be denied, the Texas Court of Criminal Appeals denied Villarreal's application for habeas

relief without written order. Villarreal then filed his petition in this Court for federal habeas relief.

## II.   LEGAL STANDARDS

### A.   *Pro Se* Pleadings

Federal courts do not hold *pro se* habeas petitions "to the same stringent and rigorous standards as . . . pleadings filed by lawyers." *Hernandez v. Thaler*, 630 F.3d 420, 426 (5th Cir. 2011) (internal quotation marks and citation omitted). "The filings of a federal habeas petitioner who is proceeding *pro se* are entitled to the benefit of liberal construction." *Id*.

### B.   The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *See Woodford v. Garceau*, 538 U.S. 202, 205-08 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Cobb v. Thaler*, 682 F.3d 364, 372-73 (5th Cir. 2012).

Federal courts look to the "last reasoned opinion" as the state court's "decision." *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012); *see Wilson v. Sellers*, 138 S. Ct. 1188,

1192 (2018). "Where a state court's decision is unaccompanied by an explanation," and the lower courts did not issue a reasoned opinion, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 526 U.S. 86, 98 (2011); *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding that there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

Review under the AEDPA is "highly deferential" to the state court's decision. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's "decision." *White v. Woodall*, 572 U.S. 415, 419 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA). AEDPA review exists only to "guard against extreme malfunctions in the state criminal justice systems." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (internal citation and quotation marks omitted). "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 419-20 (quoting *Richter*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the

state court decision "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent.  *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005).  Under the "contrary to" clause, this Court may afford habeas relief if the state court "reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts."  *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (internal quotation marks and citations omitted).  To constitute an "unreasonable application" of clearly established federal law, the state court's determination "must be objectively unreasonable, not merely wrong; even clear error will not suffice."  *Woods*, 135 S. Ct. at 1376 (internal citation and quotation marks omitted).

On factual issues, the AEDPA precludes federal habeas relief unless the state court's adjudication of the merits was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  *See* 28 U.S.C. § 2254(d)(2); *Martinez v. Caldwell*, 644 F.3d 238, 241-42 (5th Cir. 2011).

### C.    Summary Judgment Standard in Habeas Corpus Proceedings

In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). However, AEDPA modifies summary judgment principles in the habeas context, and Rule 56 "applies only to the extent that it

does not conflict with the habeas rules." *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *see Torres v. Thaler*, 395 F. App'x 101, 106 n.17 (5th Cir. 2010). "Therefore, § 2254(e)(1)— which mandates that findings of fact made by a state court are presumed to be correct— overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party." *Smith*, 311 F.3d at 668.

## III.   <u>ANALYSIS</u>

Villarreal's federal petition raises four claims:   that he was unconstitutionally denied a ruling on his request for self-representation (Claim 2); that his guilty plea was "unintelligently made" because his counsel failed to consult with him before trial and failed to respond to his repeated requests for information (Claim 3); that the trial court violated his constitutional rights when it denied his motion to suppress (Claim 4); and that his guilty plea was involuntary because his counsel failed to raise the issue of a warrantless vehicle search at his suppression hearing (Claim 5).  *See* Dkt. 1.  Although Villarreal initially brought seven claims for relief, his summary judgment response abandons three of the claims.  *See* Dkt. 12, at 8 (abandoning Claims 1, 6, and 7).

Respondent argues that all of Villarreal's claims are time-barred.   Alternatively, Respondent argues that his habeas claims lack merit.

### A.   <u>Statute of Limitations</u>

Respondent argues that all of Villarreal's claims are time-barred under 28 U.S.C. § 2244(d)(1), which provides a one-year statute of limitations for federal habeas actions. Villarreal concedes that his petition is late under the statute, but argues that he is entitled

to equitable tolling of the limitations period (Dkt. 12, at 3-8). He presents his sworn declaration, dated February 3, 2019, which avers that his limitations period should be tolled because he did not receive timely notification from the Texas Court of Appeals of its denial on April 11, 2018:

> On March 28, 2018, I was notified by the Montgomery County District Clerk that my objections had been [received] and filed with the Trial Court. I was also notified by the District Clerk that a supplement[ed] record, including my objections, was being sent to the Court of Criminal Appeals of Texas[.] [T]his was the last notification I [received] regarding my 11.07 [state habeas application].

> From March 28, 2018 to January 2019, I received no notification from either the Trial Court or the Court of Criminal Appeals concerning my 11.07 Application. On January 9, 2019 I sent the Clerk of the Court of Criminal Appeals of Texas a letter requesting an update on the status of my 11.07 Application. On January 24, 2019, I received the [Clerk's] response. [T]o my [surprise], I learned that my 11.07 Application had been denied back in April 11th of 2018!!

> With this Affidavit, I solemnly swear that I did not [receive] any notifi[cation] whatsoever . . . until the January 24th, 2019 . . . response. . . Had I been notified back in April of 2018, I would have promptly filed my 2254 petition for a Writ of Habeas Corpus in early May of 2018.

(Dkt. 1-1, at 25-26).

Equitable tolling is available in rare and exceptional circumstances. *Mathis v. Thaler*, 616 F.3d 461, 475 (5th Cir. 2010). It requires a showing that a petitioner has been pursuing his rights diligently and that "some extraordinary circumstance" prevented the timely filing of his habeas petition. *See Holland v. Florida*, 560 U.S. 631, 645 (2010); *Pace v. DiGuglielmo*, 544 U.S. 408, 419 (2005).

Respondent acknowledges that the mail logs from Villarreal's TDCJ unit in April-June 2018 do not demonstrate that Villarreal signed for any received mail during the

period (Dkt. 6, at 9). However, Respondent opposes equitable tolling in this case, arguing that Villarreal has not shown extraordinary circumstances or sufficient diligence.

The Court need not decide the equitable tolling issue. For the reasons stated below, none of Villarreal's claims warrant habeas relief.

### B.    Voluntary Guilty Plea

Villarreal claims that his guilty plea was involuntary, "unintelligently made," and the result of his trial counsel's ineffective representation.[4]

A plea that is not "voluntarily and intelligently made has been obtained in violation of due process and is void." *Matthew v. Johnson*, 201 F.3d 353, 364 (5th Cir. 2000). *See Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005); *Hill v. Lockhart*, 474 U.S. 52, 56 (1985). For a plea to be valid, the defendant must have notice the charges against him, must understand the constitutional protections waived, and must have access to the advice of competent counsel. *United States v. Shepherd*, 880 F.3d 734, 740-41 (5th Cir. 2018); *see Matthew*, 201 F.3d at 365. When the defendant makes statements "that his plea was knowing and voluntary and that he understood the rights he was waiving," the defendant's statements "create a presumption that in fact the plea is valid." *United*

---

[4]    *See* Dkt. 1, at 7 (in Claim 3, Villarreal claims that his trial counsel was constitutionally ineffective in violation of his Sixth and Fourteenth Amendment rights because counsel failed to "conduct any pretrial consultation" and failed to respond to his "repeated request[s] for information," thus rendering his guilty plea "unintelligently made"); *id*. at 12 (in Claim 5, Villarreal claims that his counsel was constitutionally ineffective in violation of his Sixth and Fourteenth Amendment rights when counsel failed to "raise the issue of the unwarranted search of [his] vehicle" during the suppression hearing, thus rendering his guilty plea "involuntary"). *See also id*. at 12 (in Claim 6, which Villarreal has now abandoned, he claimed that the cumulative effect of multiple violations of his constitutional rights rendered his guilty plea involuntary).

*States v. Washington*, 480 F.3d 309, 316 (5th Cir. 2007). On habeas review, a guilty plea will be upheld "when it is entered knowingly, voluntarily, and intelligently—that is, when the defendant understands the charge and its consequence." *Trotter v. Vannoy*, 695 F. App'x 738, 741 (5th Cir. 2017) (citing, *inter alia*, *Montoya v. Johnson*, 226 F.3d 399, 405 (5th Cir. 2000)). "[A] plea's validity may not be collaterally attacked merely because the defendant made what turned out, in retrospect, to be a poor deal." *Bradshaw*, 545 U.S. at 186. Rather, a petitioner must show "either that he made the unfavorable plea on the constitutionally defective advice of counsel or that he could not have understood the terms of the bargain he and [the State] agreed to." *Id.* (internal citation omitted).

When an ineffective-assistance claim focuses on a plea process, courts analyze "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Hill*, 474 U.S. at 56 (internal citation and quotation marks omitted); *see Shepherd*, 880 F.3d at 741. As with other claims of ineffective assistance of counsel, the petitioner must show not only that his counsel's performance was deficient, but also that he was prejudiced by counsel's performance. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). For the prejudice requirement, a petitioner must show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Shepherd*, 880 F.3d at 743 (internal citation and quotation marks omitted). In many guilty plea cases, the prejudice inquiry focuses on whether counsel's alleged errors *"*likely would have changed the outcome" of the proceeding. *Matthew*, 201 F.3d at 363 n.14 (quoting *Hill*, 474 U.S. at 59).

Villarreal claims that his counsel failed to consult with him adequately before trial, failed to respond to his repeated requests for information, and failed to raise the issue of the vehicle search at his suppression hearing (Dkt. 1, at 7, 12). He claims that these alleged defects rendered his plea "involuntary" and "unintelligently made" (*id.*).

The trial court admonished Villarreal regarding the consequences of his plea, and Villarreal took the opportunity to ask the court questions about the enhancements (Dkt. 7-7, at 96-101). The court informed him that, based on the two enhancements, the punishment range was 25 years to life, and that the parties had no agreement as to the sentence (*id.* at 94, 96). Villarreal stated that he understood and asked questions about the sufficiency of the enhancements, which the court answered (*id.* at 96-100). Villarreal stated during the proceeding that he was not complaining about his attorneys, that his counsel had done a "good job" at the suppression hearing, and that he did not wish to "go back on" the agreement with the State.[5] He then pleaded guilty, stating, "Nobody is forcing me to plead guilty" (*id.* at 101). The state habeas court, relying in part on trial counsels' affidavits, determined that Mata had adequately consulted with Villarreal before trial, had engaged in meaningful discussions with his client, and had discussed the strategy for the suppression proceeding and sentencing hearings (Dkt. 7-39, at 52, ¶¶ 8-11).

---

[5] *Id.* at 96-97 ("I'm in no way expressing any complaint against my attorneys. I think they did a good job for me today and the last couple days in the suppression hearing. So I'm not trying to complain against them. But what I am not clear on is if I have the right or how certain of the enhancement paragraphs."); *id.* at 98 ("I'm just stating Your Honor I do not wish to go back on the agreement."); *id.* at 100 ("I do not wish to go back on the agreement. I just want to have it on record that I don't know because they are not aggravated offenses.").

In these proceedings, Villarreal apparently claims that his plea was not voluntary because he did not understand the amount of evidence the State would present at the punishment phase. He states that he "was never made aware by counsel" that the State planned to present a total of 14 witnesses against him at the punishment phase, and that the State could present five extraneous offenses (Dkt. 12, at 13-14). He claims that, if he had known, he would not have pleaded guilty:

> The most important factor that Petitioner took into consideration before pleading guilty was the opportunity to receive some l[e]niency from the Court for accepting responsibility. Had Petitioner been made aware that after pleading guilty the State was going to present an extensive amount of damaging evidence again[st] him, Petitioner would have been able to understand that he gained nothing by pleading guilty. After all, what possible leniency could Petitioner have reasonably expected to receive, had he known the State was going to present so much evidence to paint the worst possible picture of him to the Sentencing Court?

(*Id*. at 14). However, at the plea proceedings, the trial court explicitly stated that the maximum sentence he could receive was life, and Villarreal stated that he understood (Dkt. 7-7, at 94, 96). Moreover, the state habeas court determined that Mata had discussed the strategy with his client "for the suppression and sentencing hearings" and was "straightforward with [him] about the likely lengthy sentence that would result from [his] significant criminal history" (Dkt. 7-39, at 52, ¶ 10). *See id*. at 2, ¶ 3 (trial counsel's affidavit, which the state court found credible, stated that counsel discussed with his client that the State's discovery responses listed over 14 extraneous offenses, including nine aggravated robberies, and that his punishment would be severe if the motion to suppress were denied, up to and including possible life imprisonment).

Villarreal's assertion in these proceedings that his plea was not voluntary is insufficient to overcome his declarations in the trial court, which are entitled to deference and a presumption of regularity. *See* 28 U.S.C. § 2254; *United States v. Kelly*, 915 F.3d 344, 349 n.4 (5th Cir. 2019) ("Solemn declarations in open court carry a strong presumption of verity" (internal citation and quotation marks omitted)); *Washington*, 480 F.3d at 316 (defendant's statements that his plea was knowing and voluntary "create a presumption that in fact the plea is valid") (internal citation and quotation marks omitted); *Carter v. Collins*, 918 F.2d 1198, 1202 n.4 (5th Cir. 1990) (trial court admonishments entitled to presumption of correctness). In the face of strong record evidence that his guilty pleas were voluntary, Villarreal has not met his burden to demonstrate that habeas relief is warranted under § 2254(d).

Villarreal also claims that his counsel was constitutionally ineffective when he failed to adequately consult with him and answer his inquiries. For a *Strickland* claim in the context of the plea process, the Courts considers whether counsel's advice was "within the range of competence demanded of attorneys in criminal cases" and whether the petitioner was prejudiced by counsel's performance. *Hill*, 474 U.S. at 57; *Shepherd*, 880 F.3d at 741. During the plea proceedings, Villarreal represented that he understood the counts he faced and the range of sentencing options, that he was not complaining about his attorneys, and that he was pleading guilty because he was guilty (Dkt. 7-7, at 96-101). The state habeas court rejected Villarreal's claim that his counsel was constitutionally ineffective, determining that Villarreal had "not suggested how counsel's alleged deficiencies had any effect on the outcome of the case" and that Villarreal had

failed to show that he had been denied effective assistance of counsel under *Strickland* (Dkt. 7-39, at 52, ¶ 12; *id*. at 54, ¶ 2). In these proceedings, Villarreal alleges no specific facts to show that his counsel's alleged deficiencies affected the outcome of his plea proceeding or sentencing. *See Matthew*, 201 F.3d at 363 n. 14. To the extent he bases his claim on the fact that he received a life sentence, habeas relief is not available to attack a guilty plea that "turned out, in retrospect, to be a poor deal." *See Bradshaw*, 545 U.S. at 186. Moreover, to merit habeas relief, Villarreal must show not merely that the state court's application of *Strickland* was incorrect, but that it was unreasonable. *See Richter*, 562 U.S. at 105 (the combined standards of *Strickland* and § 2254(d) are "doubly" deferential). Given Villarreal's declarations in open court, trial counsel's affidavits, and the state habeas court's determinations, Villarreal fails to demonstrate that the state court's determination was unreasonable under § 2254(d). His claim that his counsel was constitutionally ineffective therefore will be dismissed.

## C. Claims Preceding Guilty Plea

Villarreal brings claims for habeas relief based on the trial court's failure to rule on his request for self-representation and its denial of his motion to dismiss.[6] However,

---

[6] *See* Dkt. 1, at 6 (in Claim 2, Villarreal claims that the trial court violated his constitutional rights when it failed to rule on his request for self-representation); *id*. at 7 (in Claim 4, Villarreal claims that the trial court violated his constitutional rights when it denied his motion to suppress). *See* Dkt. 12, at 9-12 (Claim 2); Dkt. 12, at 19-24 (Claim 4). Villarreal also originally brought a claim about the trial court's denial of his motion to dismiss Mata from the case (Dkt. 1, at 6), but abandoned the claim in his summary judgment response (Dkt. 12, at 8).

the requests and motions forming the basis of his claims all preceded his plea.[7]  Because

Villarreal has not demonstrated that his guilty plea was involuntary, all of his claims

regarding proceedings before his plea are waived:

> [A] guilty plea represents a break in the chain of events which has
> preceded it in the criminal process.  When a criminal defendant has
> solemnly admitted in open court that he is in fact guilty of the offense with
> which he is charged, he may not thereafter raise independent claims relating
> to the deprivation of constitutional rights that occurred prior to the entry of
> the guilty plea.  He may only attack the voluntary and intelligent character
> of the guilty plea . . .

*Tollett v. Henderson*, 411 U.S. 258, 267 (1973).  *See United States v. Samaniego*, 532 F.

App'x 531, 534 (5th Cir. 2013) ("When a defendant enters a voluntary guilty plea, all

nonjurisdictional defects in the proceedings are waived, including ineffective assistance

of counsel, 'except insofar as the ineffectiveness is alleged to have rendered the guilty

plea involuntary,'" quoting *United States v. Glinsey,* 209 F.3d 386, 392 (5th Cir. 2000));

*Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983).  Villarreal therefore has not shown

that he is entitled to federal habeas relief on these claims, and they will be dismissed.

### D.     Ineffective Assistance of Appellate Counsel

Villarreal's petition initially brought a claim for ineffective assistance by his

appellate counsel, alleging that his counsel should have raised an issue on appeal about

---

[7]     Villarreal's exhibits to his federal petition include multiple letters from Villarreal to
Mata, the investigator, and the judge in 2013-2014, several of which complain about Mata's
failure to communicate with him (Dkt 1-1).  The exhibits also include *pro se* motions filed by
Villarreal seeking to dismiss Mata, for hybrid representation, or to suppress evidence (*id.*).
These documents were also submitted to the state habeas court.  *See* Dkt. 7-31, at 30 (exhibit
list).  All of the documents directed to Mata, or complaining about Mata, are dated between
September 29, 2013, and August 12, 2014—at least eight weeks before Villarreal's suppression
hearing and guilty plea on October 7-8, 2014 (Dkt. 7-6, Dkt. 7-7).

the trial court's decision to deny Villarreal an opportunity for allocution at the punishment phase (Dkt. 1, at 12). The state habeas court denied relief on this claim, determining that Villarreal had "waived his right to complain about a lack of allocution" (Dkt. 7-39, at 55, ¶8 (citing Texas authority)). It based its conclusion on findings that Villarreal "did not object to the trial court's failure to allow the applicant to oppose the pronouncement of his sentence" and had "not identified what reason, if any, should have prevented the pronouncement of his sentence" (*id.* at 54, ¶¶ 31-32). Respondent argues that Villarreal's claim in these proceedings lacks merit because it does not involve an error of constitutional magnitude that can be raised on habeas review, among other reasons (Dkt. 6, at 25-26)

Villarreal has abandoned his claim, and offers no argument opposing summary judgment. *See* Dkt. 12, at 8 (abandoning claim). He fails to show that he is entitled to relief under *Strickland* or that the state court's determination was unreasonable. *See Richter*, 562 U.S. at 105 (the combined standards of *Strickland* and § 2254(d) are "doubly" deferential). His claim therefore will be dismissed.

## IV.    CERTIFICATE OF APPEALABILITY

Habeas corpus actions under 28 U.S.C. § 2254 or § 2255 require a certificate of appealability to proceed on appeal. 28 U.S.C. § 2253(c)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "'that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal citation and quotation marks omitted). Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). After careful review of the record and the applicable law, the Court concludes that reasonable jurists would not find its assessment of the claims debatable or wrong. Because the petitioner does not allege facts showing that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## V.   **CONCLUSION**

For the reasons stated above the Court **ORDERS** that:

1.    Respondent's motion for summary judgment (Dkt. 6) is **GRANTED**.  The petition for a writ of habeas corpus (Dkt. 1) is **DISMISSED**.

2.    A certificate of appealability is **DENIED**.

The Clerk will provide a copy of this order to the parties.

SIGNED this day 30th day of March, 2020.

George C. Hanks Jr.
United States District Judge